UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

United States Bankruptcy Court
Southern District of Texas
FILED

JUL 0 7 2010

David J. Bradley, Clerk of Court

- - - - - - - - - - - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA,  :
                           :
            Plaintiff,     :
                           :   Criminal No. **H-1 0 - 460**
   v.                      :
                           :   18 U.S.C. § 371
                           :   15 U.S.C. § 78dd-2
SNAMPROGETTI NETHERLANDS B.V.,  :
                           :
            Defendant.     :
                           :
- - - - - - - - - - - - - - - - - - - - - - - - - - -x

## DEFERRED PROSECUTION AGREEMENT

Defendant Snamprogetti Netherlands B.V. ("Snamprogetti"), a

corporation organized under the laws of The Netherlands, Saipem S.p.A. ("Saipem"), on

behalf of its wholly owned subsidiary Snamprogetti, and ENI S.p.A. ("ENI"), on behalf

of its former wholly owned subsidiary Snamprogetti, by their undersigned attorneys, and

pursuant to authority granted by their respective Boards of Directors, and the United

States Department of Justice, Criminal Division, Fraud Section (the "Department"), enter

into this Deferred Prosecution Agreement (the "Agreement"). The terms and conditions

of this Agreement are as follows:

### Criminal Information and Acceptance of Responsibility

1.      Snamprogetti acknowledges that the United States will file the attached

two-count criminal Information in the United States District Court for the Southern

District of Texas charging Snamprogetti with conspiracy to commit an offense against the

United States in violation of 18 U.S.C. § 371, that is, to violate the anti-bribery provisions

W

of the Foreign Corrupt Practices Act ("FCPA"), as amended, 15 U.S.C. §§ 78dd-1 and

78dd-2 (Count One), and violating the anti-bribery provisions of the FCPA, 15 U.S.C.

§ 78dd-2 (Count Two).  In so doing, Snamprogetti knowingly waives:  (a) its right to

indictment on these charges, as well as all rights to a speedy trial pursuant to the Sixth

Amendment to the United States Constitution, Title 18, United States Code Section 3161,

and Federal Rule of Criminal Procedure 48(b); and (b) any objection with respect to

venue and consents to the filing of the Information, as provided under the terms of this

Agreement, in the United States District Court for the Southern District of Texas.

2.      Snamprogetti admits, accepts, and acknowledges that it is responsible

under U.S. law for the acts of its employees, subsidiaries, and agents as set forth in the

Statement of Facts attached hereto as Attachment A, and incorporated by reference into

this Agreement, and that the facts described in Attachment A are true and accurate.

Should the Department pursue the prosecution that is deferred by this Agreement,

Snamprogetti, Saipem, and ENI agree that they will neither contest the admissibility of

nor contradict the Statement of Facts in any such proceeding.  Neither this Agreement nor

the criminal Information is a final adjudication of the matters addressed in such

documents.

<u>**Term of the Agreement**</u>

3.      This Agreement is effective for a period beginning on the date on which

the criminal Information is filed and ending two (2) years from that date (the "Term").

However, Snamprogetti, Saipem, and ENI agree that, in the event that the Department

determines, in its sole discretion, that Snamprogetti, Saipem, or ENI has knowingly

violated any provision of this Agreement, an extension or extensions of the term of the

-2-

Agreement may be imposed by the Department for up to a total additional time period of one year, without prejudice to the Department's right to proceed as provided in paragraphs 12-15 below.  Any extension of the Agreement extends all terms of this Agreement for an equivalent period.

**Relevant Considerations**

4.      The Department enters into this Agreement based on the individual facts and circumstances presented by this case.  Among the facts considered were: (a) Snamprogetti, Saipem, and ENI cooperated with the Department's investigation of Snamprogetti and others; (b) Snamprogetti, Saipem, and ENI undertook remedial measures, including the implementation of an enhanced compliance program, and they agreed to undertake further remedial measures as contemplated by this Agreement; and (c) Snamprogetti, Saipem, and ENI agreed to continue to cooperate with the Department in any ongoing investigation of the conduct of Snamprogetti and its present and former employees, agents, consultants, contractors, subcontractors, subsidiaries, and others relating to violations of the FCPA.

5.      Snamprogetti, Saipem, and ENI shall continue to cooperate with the Department.  At the request of the Department, and consistent with applicable U.S. and foreign laws and regulations, Snamprogetti, Saipem, and ENI shall also cooperate fully with other law enforcement authorities and agencies in any investigation of Snamprogetti, or any of its present and former directors, employees, agents, consultants, contractors, subcontractors, and subsidiaries, or any other party, in any and all matters relating to corrupt payments and related false books and records and internal controls.

Snamprogetti, Saipem, and ENI agree that their cooperation shall include, but is not limited to, the following:

        a.      Snamprogetti, Saipem, and ENI shall truthfully disclose all factual information, including documents, records, or other tangible evidence, not protected by a valid claim of attorney-client privilege or work product doctrine with respect to Snamprogetti's activities and those of its present and former directors, employees, agents, consultants, contractors, subcontractors, and subsidiaries concerning all matters relating to corrupt payments and related false books and records and inadequate internal controls, about which they have any knowledge and about which the Department may inquire.

        b.      Upon request of the Department, Snamprogetti, Saipem, and ENI also shall designate knowledgeable employees, agents, or attorneys to provide to the Department the information and materials described in Paragraph 5(a) above on behalf of Snamprogetti.  It is further understood that Snamprogetti, Saipem, and ENI must at all times provide complete, truthful, and accurate information.

        c.      Snamprogetti, Saipem, and ENI also shall use their best efforts to make available for interviews or testimony, as requested by the Department, present or former directors, employees, agents, consultants, contractors, and subcontractors of Snamprogetti.  This obligation includes, but is not limited to, sworn testimony before a federal grand jury or in federal trials, as well as interviews with federal law enforcement and regulatory authorities.  Cooperation under this Paragraph will include identification of witnesses who, to the knowledge of Snamprogetti, Saipem, and ENI, may have material information regarding the matters described in Paragraph 5(a).

      d.     With respect to any information, testimony, documents, records, or other tangible evidence provided to the Department pursuant to this Agreement, Snamprogetti, Saipem, and ENI consent to any and all disclosures consistent with applicable law and regulation to other governmental authorities of such materials as the Department, in its sole discretion, shall deem appropriate.

**Payment of Monetary Penalty**

      6.     The Department and Snamprogetti agree that the application of the United States Sentencing Guidelines ("USSG" or "Sentencing Guidelines") to determine the applicable fine range yields the following analysis:

      A.     The 2003 USSG Manual sets forth the appropriate guidelines to be used in this matter.

      B.     Base Fine:  Based upon USSG § 8C2.4 and USSG § 2C1.1(d)(1)(B), the base fine is $214.3 million, which corresponds to the value of the benefit received in return for the unlawful payments.

      C.     Culpability Score:  Based upon USSG § 8C2.5, the culpability score is 7, summarized as follows:

| | | |
|---|---|---|
| (a) | Base Culpability Score | 5 |
| (b)(1) | The relevant organization had 1,000 or more employees and individuals within high- level personnel participated in, condoned, or were willfully ignorant of the offense and tolerance of the offense by substantial authority personnel was pervasive throughout the organization | +4 |
| (g) | The organization fully cooperated in the investigation and clearly demonstrated recognition and affirmative acceptance of and responsibility for criminal conduct | -2 |
| | Total | 7 |

-5-

D.   Calculation of Fine Range:  Based upon USSG § 8C2.7, the fine range is calculated as follows:

|  |  |
|---|---|
| Base Fine | $214.3 million |
| Multipliers | 1.4/2.8 |
| Fine Range | $300 million/$600 million |

Snamprogetti agrees to pay a monetary penalty in the amount of $240 million, or approximately 20% below the bottom of the applicable Sentencing Guidelines fine range of $300 million.  Snamprogetti agrees to pay this monetary penalty to the United States Treasury within ten days of the execution of this agreement.  If for any reason Snamprogetti fails to make such payment, Saipem and ENI agree jointly and severally to make the payment on behalf of Snamprogetti within five days of Snamprogetti's failure to pay.  The $240 million penalty is final and shall not be refunded.  Furthermore, nothing in this Agreement shall be deemed an agreement by the Department that, in the event of a breach of this Agreement, the $240 million amount is the maximum penalty that may be imposed in any future prosecution, and the Department is not precluded from arguing in any future prosecution that the Court should impose a higher fine, although the Department agrees that under those circumstances, it will recommend to the Court that the amount paid under this Agreement should be offset against any fine the Court imposes as part of a future judgment.  Snamprogetti, Saipem, and ENI acknowledge that no United States tax deduction may be sought in connection with the payment of any part of this $240 million fine.

### Conditional Release from Criminal Liability

7.      In return for the full and truthful cooperation of Snamprogetti, Saipem, and ENI, and their compliance with the terms and conditions of this Agreement, the Department agrees, subject to Paragraphs 12-14 below, not to use any information related to the conduct described in the attached Statement of Facts against Snamprogetti, Saipem, or ENI in any criminal case, except:  (a) in a prosecution for perjury or obstruction of justice; (b) in a prosecution for making a false statement; (c) in a prosecution or other proceeding relating to any crime of violence; or (d) in a prosecution or other proceeding relating to a violation of any provision of Title 26 of the United States Code.  In addition, the Department agrees, except as provided herein, that it will not bring any criminal case against Snamprogetti, Saipem, or ENI related to the conduct of present and former directors, employees, agents, consultants, contractors, and subcontractors of Snamprogetti, as described in the attached Statement of Facts, or relating to information Snamprogetti, Saipem, or ENI disclosed to the Department prior to the date on which this Agreement was signed.

a.      This Paragraph does not provide any protection against prosecution for any future corrupt payments, false books and records, or inadequate internal controls, if any, by Snamprogetti, Saipem, or ENI, or by any of their directors, employees, agents, consultants, contractors, subcontractors, and subsidiaries irrespective of whether disclosed by Snamprogetti, Saipem, or ENI pursuant to the terms of this Agreement.

b.      In addition, this Paragraph does not provide any protection against prosecution of any present or former director, officer, employee, shareholder, agent,



consultant, contractor, or subcontractor of Snamprogetti, Saipem, or ENI for any violations committed by them.

## **Corporate Compliance Program**

8.      Snamprogetti, Saipem, and ENI represent that they have implemented and will continue to implement a compliance and ethics program designed to prevent and detect violations of the FCPA, the anti-corruption provisions of Italian law, and other applicable anti-corruption laws throughout their operations, including those of their affiliates, agents, and joint ventures, and those of their contractors and subcontractors whose responsibilities include interacting with foreign officials. Implementation of these policies and procedures shall not be construed in any future enforcement proceeding as providing immunity or amnesty for any crimes not disclosed to the Department as of the date of signing of this Agreement for which Snamprogetti, Saipem, or ENI would otherwise be responsible.

9.      In order to address any deficiencies in internal controls, policies, and procedures regarding compliance with the FCPA, the anti-corruption provisions of Italian law, and other applicable anti-corruption laws, Snamprogetti, Saipem, and ENI represent that they have undertaken, and will continue to undertake in the future, in a manner consistent with all of their obligations under this Agreement, a review of the existing internal controls, policies, and procedures within Snamprogetti, Saipem, and ENI. Where necessary and appropriate, Snamprogetti, Saipem, and ENI will adopt new or modify existing internal controls, policies, and procedures in order to ensure that Snamprogetti, Saipem, and ENI maintain: (a) a system of internal accounting controls designed to ensure the making and keeping of fair and accurate books, records, and accounts; and



-8-

(b) a rigorous anti¬corruption compliance code designed to detect and deter violations of the FCPA and other applicable anti-corruption laws.  The internal controls system and compliance code will include, but not be limited to, the minimum elements set forth in Attachment C, which is incorporated by reference into this Agreement.

<strong>Deferred Prosecution</strong>

10.    In consideration of:  (a) the past and future cooperation of Snamprogetti, Saipem, and ENI described in Paragraphs 4 and 5 above; (b) Snamprogetti's payment of a monetary penalty of $240,000,000; and (c) Snamprogetti's, Saipem's, and ENI's adoption and maintenance of remedial measures, including the compliance code described in Paragraphs 8 and 9 above, the Department agrees that any prosecution of Snamprogetti for the conduct set forth in the attached Statement of Facts, and for the conduct that Snamprogetti disclosed to the Department prior to the signing of this Agreement, be and hereby is deferred for the Term of this Agreement.

11.    The Department further agrees that if Snamprogetti, Saipem, and ENI fully comply with all of their obligations under this Agreement, the Department will not continue the criminal prosecution against Snamprogetti described in Paragraph 1 and, at the conclusion of the Term, this Agreement shall expire.  Within thirty (30) days of the Agreement's expiration, the Department shall seek dismissal with prejudice of the Information filed against Snamprogetti described in Paragraph 1.

<strong>Breach of the Agreement</strong>

12.    If, during the Term of this Agreement, the Department determines, in its sole discretion, that Snamprogetti, Saipem, or ENI has (a) committed any felony under federal law subsequent to the signing of this Agreement, (b) at any time provided

-9-

deliberately false, incomplete or misleading information, or (c) otherwise breached the Agreement, Snamprogetti, Saipem, and ENI shall thereafter be subject to prosecution for any federal criminal violation of which the Department has knowledge and the Information attached as Exhibit 1 may be pursued by the Department in the U.S. District Court for the Southern District of Texas. Any such prosecution may be premised on information provided by Snamprogetti, Saipem, and ENI. Any such prosecution that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against Snamprogetti, Saipem, and ENI notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the expiration of the Term plus one year. Thus, by signing this Agreement, Snamprogetti, Saipem, and ENI agree that the statute of limitations with respect to any prosecution that is not time-barred on the date of this Agreement shall be tolled for the Term plus one year.

13.     In the event that the Department determines that Snamprogetti, Saipem, or ENI has breached this Agreement, the Department agrees to provide Snamprogetti, Saipem, and ENI with written notice of such breach prior to instituting any prosecution resulting from such breach. Snamprogetti, Saipem, and ENI shall, within thirty (30) days of receipt of such notice, have the opportunity to respond to the Department in writing to explain the nature and circumstances of such breach, as well as the actions Snamprogetti, Saipem, and ENI have taken to address and remediate the situation, which explanation the Department shall consider in determining whether to institute a prosecution.

14.     In the event that the Department determines that Snamprogetti, Saipem, or ENI has breached this Agreement:  (a) all statements made by or on behalf of Snamprogetti, Saipem, or ENI to the Department or to the Court, including the attached Statement of Facts, and any testimony given by Snamprogetti, Saipem, or ENI before a grand jury or any tribunal, at any legislative hearings, whether prior or subsequent to this Agreement, or any leads derived from such statements or testimony, shall be admissible in evidence in any and all criminal proceedings brought by the Department against Snamprogetti, Saipem, and ENI; and (b) Snamprogetti, Saipem, and ENI shall not assert any claim under the United States Constitution, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence or any other federal rule, that statements made by or on behalf of Snamprogetti, Saipem, or ENI prior or subsequent to this Agreement, and any leads derived therefrom, should be suppressed. The decision as to whether conduct or statements of any individual will be imputed to Snamprogetti, Saipem, or ENI for the purpose of determining whether Snamprogetti, Saipem, or ENI has violated any provision of this Agreement shall be in the sole discretion of the Department.

15.     Snamprogetti, Saipem, and ENI acknowledge that the Department has made no representations, assurances, or promises concerning what sentence may be imposed by the Court if Snamprogetti, Saipem, or ENI breaches this Agreement and this matter proceeds to judgment.  Snamprogetti, Saipem, and ENI further acknowledge that any such sentence is solely within the discretion of the Court and that nothing in this Agreement binds or restricts the Court in the exercise of such discretion.

-11-



### Sale or Merger of Snamprogetti, Saipem, or ENI

16.     Snamprogetti, Saipem, and ENI agree that in the event either sells, merges, or transfers all or substantially all of its business operations as they exist as of the date of this Agreement, whether such sale is structured as a stock or asset sale, merger, or transfer, Snamprogetti, Saipem, and ENI shall include in any contract for sale, merger, or transfer a provision binding the purchaser, or any successor in interest thereto, to the obligations described in this Agreement.

### Public Statements by Snamprogetti

17.     Snamprogetti, Saipem, and ENI expressly agree that they shall not, through present or future attorneys, directors, employees, agents, or any other person authorized to speak for Snamprogetti, Saipem, or ENI make any public statement, in litigation or otherwise, contradicting the acceptance of responsibility by Snamprogetti set forth above or the facts described in the attached Statement of Facts.  Any such contradictory statement shall, subject to cure rights described below, constitute a breach of this Agreement and Snamprogetti thereafter shall be subject to prosecution as set forth in Paragraphs 12-15 of this Agreement.  The decision whether any public statement by any such person contradicting a fact contained in the Statement of Facts will be imputed to Snamprogetti, Saipem, or ENI for the purpose of determining whether they have breached this Agreement shall be at the sole discretion of the Department.  If the Department determines that a public statement by any such person contradicts in whole or in part a statement contained in the Statement of Facts, the Department shall so notify Snamprogetti, Saipem, and ENI, and Snamprogetti, Saipem, and ENI may avoid a breach of this Agreement by publicly repudiating such statement(s) within five (5) business days

-12-



after notification.  Consistent with the obligations of Snamprogetti, Saipem, and ENI as set forth above, Snamprogetti, Saipem, and ENI shall be permitted to raise defenses and to assert affirmative claims in civil, regulatory, or foreign proceedings relating to the matters set forth in the Statement of Facts.  This Paragraph does not apply to any statement made by any present or former employee of Snamprogetti, Saipem, or ENI in the course of any criminal, regulatory, or civil case initiated against such individual, unless such individual is speaking on behalf of Snamprogetti, Saipem, or ENI.

18.     Snamprogetti, Saipem, and ENI agree that if they or any of their direct or indirect affiliates or subsidiaries issues a press release in connection with this Agreement, Snamprogetti, Saipem, and ENI shall first consult the Department to determine whether (a) the text of the release is true and accurate with respect to matters between the Department and Snamprogetti, Saipem, and ENI; and (b) the Department has no objection to the release.

### Limitations on Binding Effect of Agreement

19.     This Agreement is binding on Snamprogetti, Saipem, ENI, and the Department but specifically does not bind any other federal agencies, or any state, local, or foreign law enforcement or regulatory agencies, or any other authorities, although the Department will bring the cooperation of Snamprogetti, Saipem, and ENI and their compliance with their other obligations under this Agreement to the attention of such agencies and authorities, if requested to do so by Snamprogetti, Saipem, and ENI.



**Notice**

20.     Any notice to the Department under this Agreement shall be given by personal delivery, overnight delivery by a recognized delivery service, or registered or certified mail, in each case, for the Department, addressed to Deputy Chief-FCPA Unit, Fraud Section, Criminal Division, U.S. Department of Justice, Fourth Floor, 1400 New York Avenue, N.W., Washington, D.C.  20005 and, for Snamprogetti, Saipem, and ENI, addressed to Karen Patton Seymour, Sullivan & Cromwell LLP, 125 Broad Street, New York, NY  10004.  Notice shall be effective upon actual receipt by Snamprogetti.

**Complete Agreement**

21.     This Agreement sets forth all the terms of the agreement between Snamprogetti, Saipem, ENI, and the Department.  No amendments, modifications, or additions to this Agreement shall be valid unless they are in writing and signed by the Department, the attorneys for Snamprogetti, Saipem, and ENI, and duly authorized representatives of Snamprogetti, Saipem, and ENI.



**AGREED:**

**FOR SNAMPROGETTI NETHERLANDS B.V.**

By: _____

Roberto Stranieri
Chairman
Snamprogetti Netherlands B.V.

_____

Karen Patton Seymour
Nicolas Bourtin
Sullivan & Cromwell LLP

Counsel for Snamprogetti Netherlands B.V.

**FOR SAIPEM S.p.A.:**

By: _____

Pietro Franco Tali
Deputy Chairman and
Chief Executive Officer
Saipem S.p.A.

_____

Karen Patton Seymour
Nicolas Bourtin
Sullivan & Cromwell LLP

Counsel for Saipem S.p.A.

**FOR ENI S.p.A.:**

By: _____

Vincenzo Maria Larocca
General Counsel Legal Compliance
ENI S.p.A.

-15-

Karen Patton Seymour
Nicolas Bourtin
Sullivan & Cromwell LLP

Counsel for ENI S.p.A.

**FOR THE DEPARTMENT OF JUSTICE:**

DENIS J. MCINERNEY
Chief, Fraud Section
Criminal Division
United States Department of Justice

By: William J. Stuckwisch
Acting Assistant Chief
D.C. Bar No. 457278

Patrick F. Stokes
Deputy Chief
Maryland State Bar

United States Department of Justice
Criminal Division, Fraud Section
1400 New York Ave., N.W.
Washington, D.C. 20005
(202) 353-2393

Washington, D.C., on this __1ST__ day of ~~June~~ July, 2010.

-16-

### GENERAL COUNSEL'S CERTIFICATE

I have read this Agreement and carefully reviewed every part of it with outside counsel for Snamprogetti Netherlands BV ("Snamprogetti") and Saipem S.p.A. ("Saipem"). I understand the terms of this Agreement and voluntarily agree, on behalf of Snamprogetti and Saipem, to each of its terms. Before signing this Certificate, I consulted outside counsel for Snamprogetti and Saipem. Counsel fully advised me of the rights of Snamprogetti and Saipem, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into this Agreement.

I have carefully reviewed the terms of this Agreement with the Boards of Directors of Snamprogetti and Saipem. I have advised the Boards of Directors fully of the rights of Snamprogetti and Saipem, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into the Agreement. No promises or inducements have been made other than those contained in this Agreement. Furthermore, no one has threatened or forced me, or to my knowledge any person authorizing this Agreement on behalf of Snamprogetti and Saipem, in any way to enter into this Agreement. I am also satisfied with outside counsel's representation in this matter. I certify that I am General Counsel for Saipem and that I have been duly authorized by Snamprogetti and Saipem to execute this Certificate on behalf of Snamprogetti and Saipem.



Date: _30ᵗʰ June_, 2010

**SNAMPROGETTI NETHERLANDS
B.V. & SAIPEM S.p.A.**

By: _____

Pietro Galizzi
General Counsel
Saipem S.p.A.

## GENERAL COUNSEL'S CERTIFICATE

I have read this Agreement and carefully reviewed every part of it with outside counsel for ENI S.p.A. ("ENI"). I understand the terms of this Agreement and voluntarily agree, on behalf of ENI, to each of its terms. Before signing this Certificate, I consulted outside counsel for ENI. Counsel fully advised me of the rights of ENI, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into this Agreement.

I have carefully reviewed the terms of this Agreement with the Board of Directors of ENI. I have advised the Board of Directors fully of the rights of ENI, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into the Agreement.

No promises or inducements have been made other than those contained in this Agreement. Furthermore, no one has threatened or forced me, or to my knowledge any person authorizing this Agreement on behalf of ENI, in any way to enter into this Agreement. I am also satisfied with outside counsel's representation in this matter. I certify that I am General Counsel for ENI and that I have been duly authorized by ENI to execute this Certificate on behalf of ENI.



-19-

Date: _Jun 30_____, 2010

**ENI S.p.A.**

By: _____
Massimo Mantovani
General Counsel
ENI S.p.A.

## CERTIFICATE OF COUNSEL

We are counsel for Snamprogetti Netherlands BV ("Snamprogetti"), Saipem S.p.A. ("Saipem"), and ENI S.p.A. ("ENI") in the matter covered by this Agreement.  In connection with such representation, we have examined relevant Snamprogetti, Saipem, and ENI documents and have discussed the terms of this Agreement with counsel for Snamprogetti, Saipem, and ENI.  Based on our review of the foregoing materials and discussions, we are of the opinion that:  the representatives of Snamprogetti, Saipem, and ENI have been duly authorized to enter into this Agreement on behalf of Snamprogetti, Saipem, and ENI, this Agreement has been duly and validly authorized, executed, and delivered on behalf of Snamprogetti, Saipem, and ENI, and this Agreement is a valid and binding obligation of Snamprogetti, Saipem, and ENI.  Further, we have carefully reviewed the terms of this Agreement with counsel for Snamprogetti, Saipem, and ENI.  We have fully advised them of the rights of Snamprogetti, Saipem, and ENI, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into this Agreement.  To our knowledge, the decision of Snamprogetti, Saipem, and ENI to enter into this Agreement, based on the authorizations of the Snamprogetti, Saipem, and ENI Boards of Directors, is an informed and voluntary one.



Date: _____June 30_____, 2010


_____

Karen Patton Seymour
Nicolas Bourtin
Sullivan & Cromwell LLP
Counsel for Snamprogetti Netherlands
B.V., Saipem S.p.A., and ENI S.p.A.

## ATTACHMENT A

## STATEMENT OF FACTS

The following Statement of Facts is incorporated by reference as part of the Deferred Prosecution Agreement ("the Agreement") between the United States Department of Justice, Criminal Division, Fraud Section (the "Department"), Snamprogetti Netherlands B.V., Saipem S.p.A., and ENI S.p.A., and the parties hereby agree and stipulate that the following information is true and accurate.  As set forth in Paragraph 2 of the Agreement, Snamprogetti Netherlands B.V. admits, accepts, and acknowledges that it is responsible for the acts of its officers, employees, and agents as set forth below.

### The Defendant

1.      At all relevant times, Snamprogetti Netherlands B.V. ("Snamprogetti") was a Dutch corporation headquartered in Amsterdam, The Netherlands, and a wholly owned subsidiary of Snamprogetti S.p.A., an Italian engineering, procurement, and construction ("EPC") company headquartered in Milan, Italy.  In 2006, Saipem S.p.A. acquired, and became the successor company to, Snamprogetti S.p.A.

### The Joint Venture, Its Members, and Related Entities

2.      The "Joint Venture" was a four-company venture formed in 1990 for the purposes of bidding on and, if successful, performing a series of EPC contracts to design and build a liquefied natural gas ("LNG") plant and several expansions on Bonny Island, Nigeria (the "Bonny Island Project").  The Joint Venture consisted of Snamprogetti, Kellogg, Brown and Root, Inc., Technip S.A., and a company referred to herein as "EPC

Contractor D." The Steering Committee of the Joint Venture consisted of high-level executives from each Joint Venture company.  Pursuant to a joint venture agreement, the Steering Committee made major decisions on behalf of the Joint Venture, including whether to hire agents to assist the Joint Venture in winning EPC contracts, whom to hire as agents, and how much to pay the agents.  Profits, revenues, and expenses, including the cost of agents, were shared equally among the four joint venture partners.

3.      Kellogg, Brown & Root, Inc. and, before September 1998, its predecessor company, The M.W. Kellogg Company (collectively, "KBR"), were engaged in the business of providing EPC services around the world.  KBR was incorporated in Delaware and headquartered in Houston, Texas.  KBR was a "domestic concern" within the meaning of the FCPA, Title 15, United States Code, Section 78dd-2.

4.      Albert Jackson Stanley ("Stanley") was a United States citizen and a resident of Houston, Texas.  Stanley served in various capacities as an officer and/or director of KBR, and also served on the Joint Venture's Steering Committee.  Stanley was a "domestic concern" and an officer, employee, and agent of a "domestic concern" (KBR) within the meaning of the FCPA, Title 15, United States Code, Section 78dd-2.

5.      Technip S.A. ("Technip") was a French corporation headquartered in Paris, France.  At all relevant times, Technip was engaged in the business of providing EPC services around the world.  In August 2001, Technip registered a class of securities with the United States Securities and Exchange Commission ("SEC") and in October 2001 became listed on the New York Stock Exchange.  As an issuer of publicly traded securities registered pursuant to Section 12(b) of the Securities Exchange Act of 1934,



Title 15, United States Code, Section 78l, Technip was required to file periodic reports with the SEC under Section 13 of the Securities Exchange Act, Title 15, United States Code, Section 78m. Beginning in August 2001, Technip was an "issuer" within the meaning of the FCPA, Title 15, United States Code, Section 78dd-1.

6.  "EPC Contractor D" was an engineering and construction company headquartered in Yokohama, Japan.

7.  M.W. Kellogg Ltd. was a corporation organized under the laws of the United Kingdom. M.W. Kellogg Ltd. was 55% owned by KBR and 45% owned by EPC Contractor D.

8.  The Joint Venture operated through three Portuguese special purpose corporations based in Madeira, Portugal: "Madeira Company 1," "Madeira Company 2," and "Madeira Company 3." Both Madeira Company 1 and Madeira Company 2 were owned equally by the Joint Venture companies. Madeira Company 3, the entity that the Joint Venture used to enter into consulting agreements with the Joint Venture's agents, was 50% owned by M.W. Kellogg Ltd., 25% owned by Snamprogetti, and 25% owned by Technip.

### The Joint Venture's Agents

9.  Jeffrey Tesler was a citizen of the United Kingdom and a resident of London, England. The Joint Venture hired Tesler to help it obtain business in Nigeria, including by offering to pay and paying bribes to high-level Nigerian government officials. Tesler was an agent of the Joint Venture and of each of the joint venture companies.

-3-



10.     Tri-Star Investments Ltd. ("Tri-Star") was a Gibraltar corporation that Tesler used as a corporate vehicle to enter into agent contracts with and receive payments from the Joint Venture.  By the time the Joint Venture had stopped paying Tri-Star in January 2004, the Joint Venture had paid Tri-Star over $130 million for use in bribing Nigerian government officials.  Tri-Star was an agent of the Joint Venture and of each of the joint venture companies.

11.     "Consulting Company B" was a global trading company headquartered in Tokyo, Japan.  The Joint Venture hired Consulting Company B to help it obtain business in Nigeria, including by offering to pay and paying bribes to Nigerian government officials.  By the time the Joint Venture had stopped paying Consulting Company B in June 2004, the Joint Venture had paid Consulting Company B over $50 million for use in bribing Nigerian government officials.  Consulting Company B was an agent of the Joint Venture and of each of the joint venture companies.

*The Nigerian Government Entities*

12.     The Nigerian National Petroleum Corporation ("NNPC") was a Nigerian government-owned company charged with development of Nigeria's oil and gas wealth and regulation of the country's oil and gas industry.  NNPC was a shareholder in certain joint ventures with multinational oil companies.  NNPC was an entity and instrumentality of the Government of Nigeria and officers and employees of NNPC were "foreign officials" within the meaning of the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1)(A), 78dd-2(h)(2)(A), and 78dd-3(f)(2)(A).



13.     Nigeria LNG Limited ("NLNG") was created by the Nigerian government to develop the Bonny Island Project and was the entity that awarded the related EPC contracts. The largest shareholder of NLNG was NNPC, which owned 49% of NLNG. The other owners of NLNG were multinational oil companies. Through the NLNG board members appointed by NNPC, among other means, the Nigerian government exercised control over NLNG, including but not limited to the ability to block the award of EPC contracts. NLNG was an entity and instrumentality of the Government of Nigeria and its officers and employees were "foreign officials" within the meaning of the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1)(A), 78dd-2(h)(2)(A), and 78dd-3(f)(2)(A).

***The Bonny Island Project***

14.     Between 1995 and 2004, the Joint Venture was awarded four EPC contracts to build the Bonny Island Project. Each EPC contract corresponded to one of the four phases in which the Bonny Island Project was constructed. An LNG "train" is the infrastructure necessary to pipe raw natural gas from wellheads, convert the raw gas to purified LNG, and deliver that LNG to a tanker. The first phase of the Bonny Island Project consisted of two trains (Trains 1 and 2), the second phase consisted of one train (Train 3), the third phase consisted of two trains (Trains 4 and 5), and the fourth phase consisted of one train (Train 6). The first EPC contract, covering Trains 1 and 2, was awarded to the Joint Venture through an ostensibly competitive international tender. The other three EPC contracts were awarded to the Joint Venture on a sole-source, negotiated basis. The four EPC contracts awarded to the Joint Venture collectively were valued at over $6 billion.



### *Overview of The Bribery Scheme and The Violations*

15.     From at least in or around August 1994, through June 15, 2004, Snamprogetti and its co-conspirators, including the Joint Venture, KBR, Technip, EPC Contractor D, Stanley, Tesler, Tri-Star, Consulting Company B, and others, participated in a scheme to authorize, promise, and pay tens of millions of dollars in bribes to Nigerian government officials, including officials of the executive branch of the Government of Nigeria, officials of NNPC, officials of NLNG, and others, in order to secure the Nigerian government officials' assistance in obtaining and retaining billions of dollars of business related to the Bonny Island Project for Technip, the Joint Venture, and others.  Officers, employees, and agents of Snamprogetti, Stanley, other officers, employees, and agents of KBR, and their co-conspirators willfully used the mails and means and instrumentalities of interstate commerce corruptly in furtherance of the authorization, promise, and payment of bribes to Nigerian government officials pursuant to the scheme.  Stanley, other officers, employees, and agents of KBR, and other co-conspirators committed acts in furtherance of the scheme in Houston, Texas, and elsewhere in the United States.

16.     Officers, employees, and agents of Snamprogetti and their co-conspirators held so-called "cultural meetings" in which they discussed, among other things, the use of particular agents, including Tesler, to pay bribes to officials of the Government of Nigeria in order to secure the officials' support for the Joint Venture in obtaining and retaining contracts to build the Bonny Island Project.



17.     In 1994, 1999, 2001, and 2002, officers, employees, and agents of Snamprogetti and their co-conspirators authorized the hiring of Tesler and Tri-Star by the Joint Venture, expecting that Tesler and Tri-Star would pay bribes to high-level Nigerian government officials to assist the Joint Venture, Technip, and others in winning the EPC contracts to build the Bonny Island Project.  In 1996, 1999, and 2001, officers, employees, and agents of Snamprogetti and their co-conspirators also authorized the hiring of Consulting Company B by the Joint Venture, expecting that Consulting Company B would pay bribes to lower level Nigerian government officials to assist the Joint Venture, Technip, and others in winning the EPC contracts to build the Bonny Island Project.

18.     Officers, employees, and agents of Snamprogetti and their co-conspirators caused Madeira Company 3 to execute consulting contracts with Tri-Star and Consulting Company B providing for the payment of tens of millions of dollars in consulting fees in exchange for vaguely described marketing and advisory services, when in fact the primary purpose of the contracts was to facilitate the payment of bribes on behalf of the Joint Venture and its members to Nigerian government officials.

19.     Prior to NLNG's award to the Joint Venture of the various EPC contracts, Stanley, an officer of Technip, and others met with successive holders of a top-level office in the executive branch of the Government of Nigeria to ask the office holder to designate a representative with whom the Joint Venture should negotiate bribes to Nigerian government officials, and subsequently negotiated with the office holders'

-7-

representatives regarding the amount of the bribes that the Joint Venture would pay to the Nigerian government officials.

20.     Officers, employees, and agents of Snamprogetti and their co-conspirators caused wire transfers totaling approximately $132 million to be sent from Madeira Company 3's bank account in Amsterdam, The Netherlands, to bank accounts in New York, New York, to be further credited to bank accounts in Switzerland and Monaco controlled by Tesler for Tesler to use to bribe Nigerian government officials.

21.     On behalf of the Joint Venture and the four joint venture companies, Tesler wire transferred bribe payments to or for the benefit of various Nigerian government officials, including officials of the executive branch of the Government of Nigeria, NNPC, and NLNG, and for the benefit of a political party in Nigeria.

22.     Officers, employees, and agents of Snamprogetti and their co-conspirators caused wire transfers totaling over $50 million to be sent from Madeira Company 3's bank account in Amsterdam, The Netherlands, to Consulting Company B's bank account in Japan for Consulting Company B to use to bribe Nigerian government officials.

***Details of The Bribery Scheme and The Violations***

23.     On or about August 3, 1994, Wojciech Chodan ("Chodan"), an M.W. Kellogg Ltd. salesperson responsible for the Bonny Island Project, sent a facsimile from London, England, to Stanley in Houston, Texas, and to other co-conspirators stating, among other things, that Stanley, a representative of Snamprogetti, and other top executives of the joint venture companies had agreed to send a message "to the top man



-8-

that we are ready to do business in the customary manner" and to ask Consulting Company B to secure support from the key individuals at the working level of NLNG.

24.     On or about November 2, 1994, Tesler told Chodan that he had spoken with a senior official of the Nigerian Ministry of Petroleum, that Tesler's fee would be $60 million, that the first top-level executive branch official of the Government of Nigeria would get $40-45 million of that fee, that other Nigerian government officials would get the remaining $15-20 million of that fee, and that there would be a meeting between Stanley and the first top-level Nigerian executive branch official before execution of any written agreement between the Joint Venture and Tesler.

25.     On or about November 30, 1994, Stanley and other co-conspirators met with the first top-level executive branch official in Abuja, Nigeria, to verify that the official was satisfied with the Joint Venture using Tesler as its agent and to confirm that the official wanted the Joint Venture to negotiate with the senior official of the Ministry of Petroleum the amounts of bribes to various Nigerian government officials.

26.     On or about March 20, 1995, Madeira Company 3 entered into an agreement with Tri-Star providing, among other things, that Madeira Company 3 would pay $60 million to Tri-Star if the Joint Venture was awarded a contract to construct Trains 1 and 2 of the Bonny Island Project.

27.     On or about December 27, 1995, Madeira Company 3 wire transferred $1,542,000 to Tri-Star, via a correspondent bank account in New York, New York, in payment of Tri-Star's first invoice under the consulting agreement for Trains 1 and 2.

28.     On or about April 9, 1996, Madeira Company 3 entered into an agreement with Consulting Company B whereby it agreed to pay Consulting Company B $29 million for assisting the Joint Venture in winning the contract to build Trains 1 and 2 of the Bonny Island Project.

29.     On or about July 26, 1996, Tesler caused $63,000 to be wire transferred to a Swiss bank account controlled by the senior official of the Ministry of Petroleum.

30.     On or about May 1, 1997, Stanley, an executive of Technip, and other co-conspirators met in Abuja, Nigeria, with the top-level executive branch official and requested that the official designate a representative with whom the Joint Venture should negotiate bribes to Nigerian government officials in exchange for the first top-level executive branch official's support of the award to the Joint Venture of an EPC contract to build Train 3.  At the meeting, the top-level executive branch official designated a senior executive branch official as his representative.

31.     On or about February 28, 1999, Stanley, an executive of Technip, and other co-conspirators met in Abuja, Nigeria, with a second top-level executive branch official to request that the second top-level executive branch official designate a representative with whom the Joint Venture should negotiate bribes to Nigerian government officials in exchange for the second top-level executive branch official's support of the award to the Joint Venture of an EPC contract to build Train 3.  At the meeting, the second top-level executive branch official designated one of his advisers as his representative.



32.     On or about March 5, 1999, Stanley, a representative of Snamprogetti, and other co-conspirators met at a hotel in London, England, with the adviser designated by the second top-level executive branch official to negotiate the amount of bribes to be paid to the second top-level executive branch official and other Nigerian government officials in exchange for the award to the Joint Venture of an EPC contract to build Train 3.  The amount negotiated with the representative formed the basis for the $32.5 million fee that the Joint Venture promised to pay Tri-Star.

33.     On or about March 18, 1999, Madeira Company 3 entered into an agreement with Tri-Star providing, among other things, that Madeira Company 3 would pay $32.5 million to Tri-Star if the Joint Venture was awarded a contract to construct Train 3 of the Bonny Island Project.

34.     On or about March 13, 2000, Madeira Company 3 entered into a consulting agreement with Consulting Company B promising to pay it $4 million in connection with Train 3 of the Bonny Island Project.

35.     On or about January 16, 2001, Tesler caused $2.5 million to be wire transferred to a Swiss bank account controlled by the representative designated by the second top-level executive branch official of the Government of Nigeria.

36.     On or about November 11, 2001, Stanley and a KBR salesperson met in Abuja, Nigeria, with a third top-level executive branch official of the Government of Nigeria and an NNPC official (the "NNPC Official") to request that the third top-level executive branch official designate a representative with whom the Joint Venture should negotiate the bribes to Nigerian government officials in exchange for the third top-level

-11-

executive branch official's support of the award of the Trains 4 and 5 EPC contract to the Joint Venture.  At the meeting, the third top-level executive branch official designated the NNPC Official as his representative.

37.     On or about December 24, 2001, Madeira Company 3 entered into an agreement with Tri-Star providing, among other things, that Madeira Company 3 would pay $51 million to Tri-Star if the Joint Venture was awarded a contract to construct Trains 4 and 5 of the Bonny Island Project.

38.     In or about June 2002, Tesler, the NNPC Official, and an employee of one of the Joint Venture's subcontractors (the "Subcontractor") met at a hotel in London, England, to discuss the NNPC Official's request that the Subcontractor help funnel payments from Tesler to a political party in Nigeria.

39.     On or about June 14, 2002, Madeira Company 3 entered into a consulting agreement with Consulting Company B providing, among other things, that Madeira Company 3 would pay $25 million to Consulting Company B in connection with Trains 4 and 5 of the Bonny Island Project.

40.     On or about June 28, 2002, Madeira Company 3 entered into an agreement with Tri-Star providing, among other things, that Madeira Company 3 would pay $23 million to Tri-Star if the Joint Venture was awarded a contract to construct Train 6 of the Bonny Island Project.

41.     In or about August 2002, an employee of the Subcontractor, using funds that Tri-Star had wire transferred to the Subcontractor, delivered a pilot's briefcase



containing one million U.S. dollars in one hundred dollar bills to the NNPC Official at a hotel in Abuja, Nigeria, for the benefit of a political party in Nigeria.

42.     On or about March 4, 2003, Chodan caused to be e-mailed to two KBR executives in Houston, Texas, a draft memo for release to French authorities investigating potential crimes in connection with the Bonny Island Project that included false statements about how Tesler had helped the Joint Venture win the various EPC contracts.

43.     In or about April 2003, an employee of the Subcontractor, using funds that Tri-Star had wire transferred to the Subcontractor, delivered a vehicle containing Nigerian currency valued at approximately $333,333 to the hotel of the NNPC Official in Abuja, Nigeria, for the benefit of a political party in Nigeria.

44.     On or about May 30, 2003, Madeira Company 3 wire transferred $123,500 to Tri-Star, via a correspondent bank account in New York, New York, in payment of one of Tri-Star's invoices under the consulting agreement for Train 3 of the Bonny Island Project.

45.     On or about June 15, 2004, Madeira Company 3 wire transferred $3 million to Consulting Company B in payment of one of Consulting Company B's invoices under the agreement for Trains 4 and 5 of the Bonny Island Project.

46.     Between on or about April 1, 2002, and on or about January 12, 2004, employees, agents, and co-conspirators of Snamprogetti willfully aided, abetted, counseled, commanded, induced, procured, and caused the commission of FCPA violations by KBR, a domestic concern within the meaning of the FCPA, by aiding and abetting KBR in causing wire transfers of $39.8 million from Madeira Company 3's bank

-13-

K

account in Amsterdam, The Netherlands, via a correspondent bank account in New York, New York, to a bank account of Tri-Star in Switzerland pursuant to Madeira Company 3's consulting agreement with Tri-Star for Trains 4 and 5, intending that the money would be used, in whole or in part, to pay bribes to Nigerian government officials.

## ATTACHMENT B

## <u>CERTIFICATE OF CORPORATE RESOLUTIONS</u>

WHEREAS, Saipem S.p.A. (the "Company") has been engaged in discussions with the United States Department of Justice, Criminal Division, Fraud Section ("the Department") about certain illegal payments to foreign officials to facilitate the award of contracts and assist in obtaining business for the Company's wholly owned subsidiary Snamprogetti Netherlands B.V.; and

WHEREAS, in order to resolve such discussions, it is proposed that the Company enter into a certain agreement with the Department; and

WHEREAS, the Company's General Counsel, Pietro Galizzi, has advised the Board of Directors of the Company of its rights, possible defenses, the Sentencing Guidelines' provisions, and the consequences of entering into such agreement with the Department;

Therefore, the Board of Directors has RESOLVED that:

1.     The Deputy Chairman and Chief Executive Officer, Pietro Franco Tali, is hereby authorized, empowered, and directed, on behalf of the Company, to execute the Deferred Prosecution Agreement substantially in such form as reviewed by this Board of Directors at this meeting with such changes as the General Counsel may approve;

2.     The General Counsel of the Company, Pietro Galizzi, is hereby authorized, empowered, and directed to take any and all actions as may be necessary or appropriate and to approve the forms, terms, or provisions of any agreement or other documents as may be necessary or appropriate, to carry out and effectuate the purpose and intent of the foregoing resolutions; and



3.      All of the actions of the General Counsel of the Company, Pietro Galizzi, which actions would have been authorized by the foregoing resolutions except that such actions were taken prior to the adoption of such resolutions, are hereby severally ratified, confirmed, approved, and adopted as actions on behalf of the Company.

Date: ___June 30___, 2010

_____
Giulio Bozzini
Corporate Secretary
Saipem S.p.A.



-2-

## CERTIFICATE OF CORPORATE RESOLUTIONS

WHEREAS, Snamprogetti Netherlands B.V. (the "Company") has been engaged in discussions with the United States Department of Justice, Criminal Division, Fraud Section ("the Department") about certain illegal payments to foreign officials to facilitate the award of contracts and assist in obtaining business for the Company; and

WHEREAS, in order to resolve such discussions, it is proposed that the Company enter into a certain agreement with the Department; and

WHEREAS, the General Counsel of the Company's parent, Pietro Galizzi, has advised the Board of Directors of the Company of its rights, possible defenses, the Sentencing Guidelines' provisions, and the consequences of entering into such agreement with the Department;

Therefore, the Board of Directors has RESOLVED that:

1.      The Company (i) consents to the filing in the United States District Court for the Southern District of Texas of a two-count Information charging it with conspiracy to commit an offense against the United States in violation of 18 U.S.C. § 371, that is, to violate the anti-bribery provisions of the Foreign Corrupt Practices Act ("FCPA"), as amended, 15 U.S.C. §§ 78dd-1 and 78dd-2 (Count One); and aiding and abetting violations of the anti-bribery provisions of the FCPA, 15 U.S.C. § 78dd-2 and 18 U.S.C. § 2 (Count Two); (ii) waives indictment on such charges and enters into a Deferred Prosecution Agreement with the Department; and (iii) agrees to accept a monetary penalty of $240,000,000, and to pay $240,000,000 to the United States Treasury with respect to the conduct described in the Information;



2.      The Chairman of the Company, Roberto Stranieri, is hereby authorized, empowered, and directed, on behalf of the Company, to execute the Deferred Prosecution Agreement substantially in such form as reviewed by this Board of Directors at this meeting with such changes as the General Counsel of the Company's parent may approve;

3.      The General Counsel of the Company's parent, Pietro Galizzi, is hereby authorized, empowered, and directed to take any and all actions as may be necessary or appropriate and to approve the forms, terms, or provisions of any agreement or other documents as may be necessary or appropriate, to carry out and effectuate the purpose and intent of the foregoing resolutions; and

4.      All of the actions of the General Counsel of the Company's parent, Pietro Galizzi, which actions would have been authorized by the foregoing resolutions except that such actions were taken prior to the adoption of such resolutions, are hereby severally ratified, confirmed, approved, and adopted as actions on behalf of the Company.

Date: 18th day of June, 2010

Claudio Faedi
Corporate Secretary
Snamprogetti Netherlands B.V.



## CERTIFICATE OF CORPORATE RESOLUTIONS

WHEREAS, ENI S.p.A. (the "Company") has been engaged in discussions with the United States Department of Justice, Criminal Division, Fraud Section ("the Department") about certain illegal payments to foreign officials to facilitate the award of contracts and assist in obtaining business for the Company's former wholly owned subsidiary Snamprogetti Netherlands B.V.; and

WHEREAS, in order to resolve such discussions, it is proposed that the Company enter into a certain agreement with the Department; and

WHEREAS, the Company's General Counsel, Massimo Mantovani, has advised the Board of Directors of the Company of its rights, possible defenses, the Sentencing Guidelines' provisions, and the consequences of entering into such agreement with the Department;

Therefore, the Board of Directors has RESOLVED that:

1.  The Company hereby agrees to the terms of the Deferred Prosecution Agreement;

2.  The Company's General Counsel, Massimo Mantovani, and the Company's General Counsel Legal Compliance, Vincenzo Maria Larocca, (the "Company's Counsel") are hereby authorized, empowered, and directed, on behalf of the Company to execute, as single signatories, the Deferred Prosecution Agreement, the General Counsel's Certificate, and any other documents that may be necessary and appropriate to carry out the intent of the foregoing resolutions, substantially in such form as reviewed by this Board of Directors at this meeting with such formal changes as the Company's Counsel may approve;

3.  The Company's Counsel, Massimo Mantovani and Vincenzo Maria Larocca, are hereby authorized, empowered, and directed, as single signatories, to take any and all additional actions as may be necessary or appropriate to carry out the intent of the foregoing resolutions.

Date: June 15, 2010

_____
Roberto Ulissi
Corporate Secretary
ENI, S.p.A.

**ATTACHMENT C**

**CORPORATE COMPLIANCE PROGRAM**

In order to address deficiencies in internal controls, policies, and procedures regarding compliance with the Foreign Corrupt Practices Act ("FCPA"), 15 U.S.C. §78dd-1, *et seq.,* and other applicable anti-corruption laws, Snamprogetti Netherlands B.V., Saipem S.p.A., and ENI S.p.A. (collectively, the "company") agree to conduct, in a manner consistent with this Agreement, a review of their existing internal controls, policies, and procedures.

Where necessary and appropriate, the company further agrees to adopt new or to modify existing internal controls, policies and procedures in order to ensure that it maintains: (a) a system of internal accounting controls designed to ensure that the company makes and keeps fair and accurate books, records, and accounts; and (b) a rigorous anti-corruption compliance code, standards, and procedures designed to detect and deter violations of the FCPA and other applicable anti-corruption laws. At a minimum, this should include, but not be limited to, the following elements:

1.      A clearly articulated corporate policy against violations of the FCPA and other applicable anti-corruption laws;

2.      A system of financial and accounting procedures, including a system of internal accounting controls, designed to ensure the maintenance of fair and accurate books, records, and accounts.

3.      Promulgation of a compliance code, standards, and procedures designed to detect and deter violations of the FCPA, other applicable anti-corruption laws, and the company's compliance code. This code and these standards and procedures

should apply to all directors, officers, and employees and, where necessary and appropriate, outside parties acting on behalf of the company in foreign jurisdictions, including agents, consultants, representatives, distributors, teaming partners, and joint venture partners (collectively referred to as "agents and business partners").

4.      The assignment of responsibility to one or more senior corporate officials of the company for the implementation and oversight of compliance with policies, standards, and procedures regarding the FCPA and other applicable anti-corruption laws. This senior corporate official shall have authority to report matters directly to the Board of Directors or an appropriate committee of the Board of Directors and the General Counsel.

5.      Mechanisms designed to ensure that the policies, standards, and procedures of the company regarding the FCPA and other applicable anti-corruption laws are effectively communicated to all directors, officers, employees and, where necessary and appropriate, agents and business partners. These mechanisms shall include: periodic training for all such directors, officers, employees, agents, and business partners; and annual certifications with regard to this training by all such directors, officers, employees, agents, and business partners.

6.      An effective system for reporting, and for supporting those who in good faith report, suspected criminal conduct and/or violations of the compliance policies, standards, and procedures regarding the FCPA and other applicable anti-corruption laws for directors, officers, employees, agents, and business partners.



7.       Appropriate disciplinary procedures to address, among other things, violations of the FCPA, other applicable anti-corruption laws, or the company's compliance code by directors, officers, and employees.

8.       Appropriate due diligence requirements pertaining to the retention and oversight of agents and business partners.

9.       Standard provisions in agreements, contracts, and renewals thereof with all agents and business partners that are designed to prevent violations of the FCPA and other applicable anti-corruption laws, which may, depending upon the circumstances, include: anti-corruption representations and undertakings relating to compliance with the FCPA and other applicable anti-corruption laws; rights to conduct audits of the books and records of the agent or business partner to ensure compliance with the foregoing; and rights to terminate an agent or business partner as a result of any violation of the FCPA or other anti-corruption laws or breach of representations and undertakings related to such matters.

10.      Periodic testing of the compliance code, standards, and procedures to evaluate their effectiveness in detecting and reducing violations of the FCPA, other applicable anti-corruption laws, and the company's policy against such violations.

-3-